SHINN, P. J.
 

 Robinson is executor under the will of George D. B. Young. At the time of his death in 1951, Young held the Beyls’ promissory notes for $4,000, $2,000, $1,000 and $1,500, each secured by a deed of trust on a single parcel of property owned by them. The $1,000 note was returned marked paid in 1955. Robinson commenced foreclosure proceedings on the trust deeds securing the remaining notes, whereupon the Beyls brought the present action to quiet title to the parcel, to restrain foreclosure of the trust deeds and for cancellation of the $4,000, $2,000 and $1,500 notes on the ground that they were fully paid and discharged prior to
 
 *446
 
 Young’s death. Robinson answered and counterclaimed, alleging there was a balance due of $7,043.01 on the three notes, plus accrued interest. The court made findings and entered judgment cancelling the notes, ordering reconveyance of the trust deeds and awarding Robinson $216.33 as the balance of unpaid principal and interest due on the $1,500 note. Robinson appeals.
 

 This case has its unusual aspects which will be developed in our statement of the evidence. Young was a licensed real estate broker; Beyl was a licensed building contractor. For many years prior to the execution of the notes and trust deeds Young had lent money to Beyl and Beyl had built homes and done other work for Young. The relationship between the two men was a close one and Beyl had complete confidence that Young would keep correct records. As to the notes in question, these records consisted of notations on file cards listing the amount and terms of the notes, the payments made by Beyl, if any, and the balances due after each payment. On the reverse of some of Beyl’s checks Young made notations of the balance due under the note to which the cheek applied, but Beyl testified that he paid no attention to the writing on the back of his cancelled checks until the amount of his indebtedness became a matter of controversy between himself and appellant. Beyl kept no record of his payments.
 

 The $4,000 note was executed March 21, 1947, and was due in two years. The $2,000 note was executed January 7, 1948, and was likewise due in two years. The $1,000 note which, as we have said, is not in controversy, was executed March 18, 1948, and was due in one year. The $1,500 note was executed January 31, 1950, and was also due in one year. According to Young’s records, Beyl paid the interest due on the $2,000 note until July, 1949, but made no payments on the principal; he paid $500 on the $1,000 note plus interest until August, 1948; he made.payments of principal and interest on the $4,000 note reducing the balance due to $3,543.01; he made no payments on the note for $1,500. The last cash payment made by Beyl on any of the notes prior to Young’s death, as shown by Young’s records, was a payment of interest on the $2,000 note in August, 1949. At this time, Young’s records showed a total balance due on the first three notes of $6,043.01. The amount of unpaid principal claimed by appellant consisted of $6,043.01, less $500 subsequently paid on the $1,000 note, plus $1,500 on the fourth note, or a total of $7,043.01.
 

 
 *447
 
 The crucial factual question at the trial was the accuracy and completeness of the records kept by Young upon which alone appellant was relying. Beyl testified at length in an effort to prove that these records did not reflect a substantial credit arising out of a joint venture agreement for the improvement and sale of another parcel of real property, a $2,000 credit for construction work he performed for a Mrs. Lewis at Young’s request, an oral agreement of settlement whereby the two men balanced and cancelled out their respective claims against one another as of August, 1949, including the indebtedness on the first three notes, and an $800 credit for performing certain odd jobs for Young after the making of the alleged settlement agreement. Appellant was unfamiliar with the transactions between Young and Beyl and his testimony shed no light upon them. As we shall see, these transactions were bewildering in their complexity.
 

 The provisions of the judgment cancelling the notes and awarding appellant $216.33 on the $1,500 note were based upon the following findings: At the time of Young’s death in 1951 the Beyls were indebted to him only upon the $1,500 note. In August, 1949, the two men entered into an oral agreement cancelling the first three notes, including the $1,000 note upon which Beyl owed Young $541.66 plus $54.17 interest. Before Young’s death and subsequent to the execution of the $1,500 note, Beyl performed services for Young having a reasonable value of $800 for which he received no compensation. After Young’s death and following commencement of foreclosure proceedings on the trust deed securing the $1,000 note, Beyl paid $595.83 to prevent a foreclosure; the payment was made under a mistake of fact. We have set forth in the margin the findings as to the August, 1949, agreement and the payment of the $1,000 note.
 
 [1]
 
 The court also found that
 
 *448
 
 the Beyls were entitled to set off against the $1,500 note the sum of $800 as the value of Beyl’s services, together with $595.83, as the amount of the cancelled indebtedness which he mistakenly paid appellant on the $1,000 note, or a total offset of $1,395.83. Upon the remaining balance of $104.17, appellant was awarded interest totaling $112.16.
 

 Evidence of the following facts was elicited through the testimony of Beyl and numerous exhibits. In March, 1947, the Beyls borrowed $4,000 from Young to finance the building of a home upon a parcel of unimproved real property which they owned in Arrowhead Woods. They gave him as evidence of the indebtedness and as security the first of the notes and trust deeds which are now in question. The Beyls also owned 5 acres in San Bernardino County containing a house and an orange grove; the property was subject to a $1,500 encumbrance. At the same time Young held a $10,000 trust deed note on property in Los Angeles owned by one Cooper consisting of a vacant lot and two other lots improved with eight rental units; the units were known as the Fernleaf Courts. At Young’s suggestion, the Beyls exchanged their five acres for Cooper’s lots and assumed the $10,000 note in consequence of an oral agreement that Beyl would improve the courts for the purpose of sale and that upon such a sale the Beyls would receive the first $5,000 of the proceeds. Young would receive the next $10,000 to satisfy the trust deed obligation and any remaining balance would be divided evenly.
 

 Beyl performed extensive renovating work on the courts, buying materials, making repairs and paying interest on the $10,000 note out of the rentals. He retained none of the rentals but did not account to Young for his expenditures. The three lots were listed with real estate brokers, but as Beyl was unable to find a purchaser at his asking price of $17,500, he and Young entered into another oral agreement, the former to build a house on the vacant lot and sell it separately so as to reduce the price of the courts, the latter to finance the con
 
 *449
 
 struction. Young made a new construction loan of $4,500. It was also agreed that Young would receive the first $4,500 upon a sale of the house and the balance would be evenly divided. And since Young’s trust deed affected all three lots, it was further agreed that the vacant lot would be released from the loan for $1,500, its estimated value, to be paid out of the escrow proceeds. Beyl built the house, which he sold for $9,000 to a Mrs. Saucedo. Out of the proceeds of the escrow Young received $4,725 in satisfaction of his construction loan and $1,500 on account of the release of the lot. Beyl received $97.59 in cash. A note and second trust deed of $2,000 were executed in favor of Beyl. Beyl assigned the note and trust deed to Young and it was established by Young’s records and by the testimony of Beyl and Mrs. Saucedo that except for the first monthly payment all installments due under the $2,000 note were paid to Young until he sold the note.
 

 The Saucedo escrow closed in June, 1948, several months after Young had made two additional loans of $2,000 and $1,000 to the Beyls, each note secured by a deed of trust on the Arrowhead Woods property. The courts were sold for $12,500, also in June. Young received out of escrow the sum of $9,644 in satisfaction of the trust deed encumbrances and an additional $1,100 released to him at Beyl’s request. Beyl received $822.79. It appears from one of the exhibits that the $1,100 was turned over to Young as partial payment of three unsecured promissory notes representing loans totaling $1,225. We have set out the exhibit in the margin.
 
 [2]
 
 It pur
 
 *450
 
 ports to be an accounting between the two men as of June 10, 1948. With respect to the $1,169.77 listed at the bottom of the exhibit Beyl testified that the amount was to be credited toward payment of his indebtedness upon the three trust deed notes; he did not receive it in cash. Young’s bank statement, which was in evidence, indicated a withdrawal of $1,169.77 from his checking account on June 10th. Mention is also made in appellant’s brief of an exhibit attached to a deposition submitted together with an affidavit in support of appellant's motion for new trial. But appellant’s notice of motion and the supporting documents were stricken upon motion of plaintiffs as not having been timely filed, and the exhibit cannot be deemed to be a part of the record.
 

 During the same month of June, 1948, Beyl told Young that he thought he owed $2,800 on the secured notes and the latter replied: “Well, I haven’t just figured it out exactly, but we think it is about $2,800.” At this time Young’s records showed a balance due of $6,695.81.
 

 We have already referred to the three unsecured notes upon which Beyl paid Young $1,100 out of the Fernleaf Courts escrow. These notes were returned to the Beyls. Another unsecured note in the amount of $650, executed in October, 1948, was held by Young at the time of his death although Beyl testified that he had paid it.
 

 In April, 1949, Young told Beyl that one of his “clients,” a Mrs. Lewis, owned property which had been condemned by the Los Angeles Building and Safety Department and asked him to see what could be done to renovate it. After inspecting the property and discussing proposed alterations with the authorities, Beyl prepared plans and drawings and told Young that the job could be done for $2,000. It is unclear from Beyl’s contradictory testimony on this point whether the $2,000 was to include any compensation to him if he did the work himself, although he testified that Young promised to pay him for his services. A building permit was obtained and Beyl entered into a written agreement with Mrs. Lewis to renovate the property for $2,500, $200 to be paid in cash by Mrs. Lewis, the balance to be financed by a $2,300 loan from Young secured by a second trust deed on the property. According to Beyl, $500 represented a bonus to the lender. The trust deed named appellant, individually, as beneficiary and Robinson admitted in his testimony that this was one of more than 40 transactions in which Young used his name but in which he had no financial interest. Robinson also ad
 
 *451
 
 mitted that Young made a number of spurious gifts of trust deeds to him in order to avoid paying income tax.
 

 Before work commenced the building and safety department required the building of side yards and the installation of sanitary facilities. Beyl obtained Mrs. Lewis’ written agreement to pay $450 for this additional work but a few days later she told him she would not pay it. When Beyl mentioned to Young that Mrs. Lewis insisted on completion of the job for the original contract price, Young advised him to go ahead even though Beyl thought the cost would exceed the amount of the $2,300 loan. The job was completed in August, 1949.
 

 In a little black book Beyl kept a daily record of his work on the Lewis job and a list of his receipts and expenditures. The book was received in evidence together with 12 checks issued by Young in the total amount of $2,222.15. Cheeks totaling $1,180.29 were made out to Beyl; checks totaling $1,041.86 were made out to materialmen or subcontractors. Of the money which he received, Beyl presumably deposited $680.29; one $500 check he endorsed to Carolyn M. Burr, who was the beneficiary named in the trust deeds securing his $2,000 and $1,000 loans from Young. Beyl’s list of money received indicated the receipt of $2,299.88, including the $200 which Mrs. Lewis paid him in cash. In addition, Beyl admitted receiving from Young checks for $29.80 and $92.47. The total amount was $2,422.15.
 

 It is impossible to reconcile these figures either with Beyl’s testimony or with his list of expenditures. Beyl testified that he received $1,612.51 and spent $1,756.45. The written list indicates that he paid out $1,923.53. However, the list is apparently in error by at least $772, resulting from inclusion of the plumber's $650 and $122 bids for plumbing and sewer work in addition to the amount of two of Young’s cheeks made out to the plumber in full payment for his services.
 

 In early September Beyl had another conversation with Young.
 
 [3]
 
 The substance of the conversation was that Beyl
 
 *452
 
 told Young that he spent 38 full days working on the Lewis job and that he thought his services were worth $2,000. Young replied: “You don’t owe me that much money ... I think you owe me about $1,700, $1,800 ... we will have other deals. Say we just call it square. ... We will wipe the slate clean and that will be it.” Beyl agreed. Young promised to have the trust deeds reconveyed and to cancel the $4,000, $2,000 and $1,000 notes. At this time the latter’s records showed a balance due on the three secured notes of $6,043.01 and, as we have said, Young also held the Beyls’ unsecured note for $650. According to Beyl, Young made no further requests for payment upon any of the notes.
 

 In January, 1950, the Beyls borrowed a further $1,500 from Young, executing another note and deed of trust on their home in Arrowhead Woods. Young told Beyl that the trust deed would be a first trust deed and the instrument contained no subordination clause. Later the same year, Beyl performed various odd jobs for Young for which he claimed compensation at the trial at the rate of $50 per day. As mentioned earlier, the court gave him a credit of $800 as the reasonable value of his services. This aspect of the judgment is not in dispute for appellant concedes in his brief that Beyl was properly credited with the $800.
 

 After Young’s death in 1951, all four trust deed notes and the $650 note were found in his active files. Appellant sent a letter to Beyl, seeking payment of the notes. Beyl told appellant that he could not possibly owe more than $1,500, the amount of the last note, less what was due him for the odd
 
 *453
 
 jobs, and he offered to pay $1,500 in settlement. At a meeting held in the office of appellant’s counsel, Beyl was informed by the attorneys that if the matter were taken to court he would not be permitted to testify as to his dealings with Young because of the “dead-man’s statute.” He was also informed that appellant had no records of the orange grove and Fern-leaf Courts transactions. During an extensive correspondence subsequent to this conversation Beyl raised his offer of settlement first to $4,000, then to $5,000, believing that his testimony would be inadmissible and that appellant had no records of his transactions with Young. He admitted being asked to produce his own records and to supply facts justifying a settlement and that he did not do so.
 

 When foreclosure proceedings were commenced on the trust deed securing the $1,000 note Beyl paid $965.30 to prevent the foreclosure; this amount represented the balance claimed on the note, plus interest and trustee’s charges and included $541.66 which the trustee claimed was the amount of principal on the date of Young’s death. He had not consulted an attorney and was still of the belief that his testimony would be barred in court.
 

 The first contention to be considered is the asserted insufficiency of the evidence to support the finding that Beyl and Young entered into the oral settlement agreement described by Beyl. Appellant says there was absolutely no basis in the evidence for the finding. In this connection, appellant argues that Beyl was unworthy of belief because his narrative of his dealings with Young was not only inconsistent in itself but incompatible with the facts disclosed by the exhibits which were in evidence. Although the argument might well have impressed the trial court, it' did not prevail. In the court’s memorandum of decision incorporated in the findings by reference, the court said: “I am satisfied that, subject to the possibility of such innocent mistakes as the most honest person will make in observation, recollection and expression, Mr. Beyl testified truthfully. I judge him to be a solid, substantial, dependable gentleman characterized by integrity and fairness of intent.” It is not for us to decide whether Beyl was a truthful witness. In order to determine that the finding of the settlement agreement cannot be sustained we would have to hold that it was established by uncontradicted evidence that the agreement could not possibly have been made. We cannot so hold. The evidence at .the trial was in conflict and
 
 *454
 
 susceptible of conflicting inferences. Beyl’s account- of his conversation with Young was, of course, to be considered with the other evidence in the ease, including his testimony as to his earlier and later transactions with Young and the various documents which were produced. There was some evidence corroborating Beyl. Setting aside the $1,169 which Beyl claims should have been credited to him on the notes and which appellant claims was paid by check, there was nevertheless the $2,000 trust deed transferred to Young at the close of the Saucedo escrow. Although Beyl stated that he did so because the instrument belonged to Young, $1,100 which he received from the Fernleaf Courts escrow was unquestionably applied to the balance on the unsecured notes. It was not an unreasonable inference that the amount of the trust deed was to be applied to the secured notes. If so, Young’s records were substantially in error, a circumstance which lends additional weight to Beyl’s testimony that he was also to receive a $1,169 credit from the Saucedo escrow. There was thus some evidence from which the court could conclude that in August, 1949, the Beyls’ indebtedness on the three secured notes was considerably less than the $6,043 listed in Young’s records and claimed by appellant. Furthermore, Young later accepted as security for the $1,500 loan a trust deed on the Beyls’ home which did not recite that it was subordinate to any other liens on the property. Although the earlier $1,000 trust deed likewise did not contain a subordination clause, this was a circumstance from which the court could infer that the obligations under the first three deeds of trust had been extinguished. But we need go no further in our analysis. It is futile to argue that the trial court was required to find that Beyl and Young did not know the approximate amounts of their respective obligations when they made their settlement agreement.
 

 The court’s factual decisions were reached after a careful and conscientious consideration and review of the evidence. Having faith in the credibility of Beyl the court could not reasonably have found that his testimony was overcome by the dubious and unverified records of Young.
 

 Appellant says in his brief that the challenged finding means only that the parties agreed to cancel Beyl’s $595.83 indebtedness upon the $1,000 note. But this is an untenable interpretation. The court made a specific finding as to the $595.83 in order to elucidate its further finding as to the circumstances under which the $1,000 note was repaid by Beyl after Young’s
 
 *455
 
 death. Beyl’s testimony that he paid the note believing that appellant had no records to substantiate his own account of the Saucedo and Fernleaf Courts transactions clearly established that the payment was made under a mistake of fact.
 

 The next contention requiring discussion is that the oral settlement agreement was invalid. Under this head, appellant argues that the agreement was made without consideration and that Young’s undertaking to cancel the notes was one required to be in writing by subdivision 2 of section 1973 of the Code of Civil Procedure since it was a promise to answer for the debt of Mrs. Lewis. The argument cannot be maintained. Young’s promise was not within the Statute of Frauds. Although Beyl had a written contract with Mrs. Lewis to renovate her property, Young paid all but $200 of the expenses of the job and it is manifest from the earlier conversations between the two men that Beyl was looking to Young for compensation for his services. Nor can it be said that there was no consideration for the agreement. The amount of Beyl’s indebtedness was uncertain. Young thought Beyl owed about $1,700 or $1,800. Beyl’s agreement to give up his $2,000 claim was clearly a sufficient consideration for Young’s agreement to give up his claim in an unliquidated lesser amount upon the notes.
 

 Appellant further contends that the court should have made 21 additional findings respecting various aspects of the transactions between Beyl and Young and that he suffered prejudice by reason of the court’s failure to make such additional findings. It is asserted that the present action is one for an accounting in which detailed findings as to each debit and each credit in all the transactions between the parties were mandatory. We cannot agree. As mentioned earlier, the action is one to quiet title to real property as against the lien of certain trust deeds and for the cancellation of the notes secured by the deeds of trust. More detailed findings were unnecessary and we think that the findings that were made fully and fairly disposed of the issues in the ease.
 

 There remain to be considered contentions that the court erred in receiving Beyl’s testimony regarding events occurring prior to Young’s death and that the action is barred by Beyl’s failure to file a creditor’s claim, by limitations and by laches. As we shall see, these contentions are devoid of merit.
 

 Section 1880, subdivision 3 of the Code of Civil Procedure provides that parties to an action or proceeding against
 
 *456
 
 an executor or administrator upon a claim or demand against the estate of a deceased person may not testify as to any matter or fact occurring before the death of the decedent. Beyl’s testimony respecting his transactions with Young was received over appellant’s objection that he was disqualified as a witness by virtue of the statute. The objection was properly overruled. It is settled that the statute does not apply to actions to quiet title to property in which the plaintiff claims an interest adverse to the estate.
 
 (Streeter
 
 v.
 
 Martmelli,
 
 65 Cal.App.2d 65 [149 P.2d 725];
 
 In re Hill,
 
 13 Cal.App.2d 326 [57 P.2d 155].)
 

 Under sections 707 and 716 of the Probate Code, the holder of a claim against an estate shall not maintain an action upon the claim unless it is first filed with the clerk or presented to the representative of the estate within the time allowed by law. We cannot agree that the Beyls were precluded by the statutes from maintaining their suit. They are not proceeding as creditors of the estate but are seeking to defeat a money claim which appellant attempted to enforce by foreclosure of the trust deeds. Had appellant brought a foreclosure action in which the Beyls were the defendants, they would clearly have been entitled to prove payment of the notes notwithstanding the fact that no creditor’s claim was filed.
 
 (Loucks
 
 v.
 
 Luckel,
 
 107 Cal.App.2d 217 [236 P.2d 905].)
 

 There is no substance to appellant’s final contentions, which are that the action was barred by laches and by the limitation statutes applicable to actions based upon fraud and mistake and upon contracts not founded on a writing. (Code Civ. Proc., § 338, subd. 4; § 339, subd. 1.) The Beyls were not required to remove the cloud upon their title represented by the trust deeds until appellant asserted a hostile claim by commencing foreclosure proceedings.
 
 (Secret Valley Land Co.
 
 v.
 
 Perry,
 
 187 Cal. 420 [202 P. 449];
 
 Newport
 
 v.
 
 Hatton,
 
 195 Cal. 132 [231 P. 987];
 
 Cole
 
 v.
 
 Ames,
 
 155 Cal.App.2d 8 [317P.2d662].)
 

 As mentioned earlier, appellant made a motion for new trial which was stricken from the record upon the ground that it was not timely filed. He has noticed appeals from the granting of the motion to strike and the denial of his motion for new trial but he does not urge error in those rulings. The attempted appeals from these orders are dismissed and the judgment is affirmed.
 

 Vallée, J., and Ford, J., concurred.
 

 [1]
 

 "At the time of the death of said George D. B. Young, plaintiffs were not indebted to him, on or by virtue of any of said promissory notes, except the one in the principal sum of $1,500 executed on January 31, 1950, or otherwise or at all, except for such sum as they owed on the said $1,500 note. In or about the month of August, 1949, following payments in money by plaintiffs to Young, the performance of services for him by plaintiff, Frederick C. Beyl, the receipt of moneys by him for the use and benefit of plaintiffs, said Young and plaintiffs made an agreement of settlement balancing and cancelling out all their reciprocal claims and accounts, and acknowledging full payment of all indebtedness represented by all said notes except the one for $1,500 not then executed. Immediately before the making of said agreements the unpaid balance on said $1,000 note, as claimed by decedent Young, amounted to the sum of $541.66 on principal, and the sum of $54.17 as interest,
 
 *448
 
 a total sum of $595.83. It was the intention of the parties by said agreement to cancel out said claimed indebtedness of $595.83.
 

 "Before plaintiffs had employed any attorney at law to advise them in respect to matters herein found, defendant had caused proceedings to be commenced to foreclose the trust deed securing the said $1,000 note. To prevent the imminent foreclosure of said trust deed, and acting under mistake of fact, plaintiffs paid all the claimed balance on said $1,000 note together with costs theretofore incurred in the foreclosure proceedings, and, in doing so, they paid to defendant the aforesaid sum of $595.83, which plaintiffs and decedent Young had intended be cancelled out as an indebtedness from plaintiffs to Young."
 

 [2]
 

 "Notes 450.00
 

 500.00
 

 275.23
 

 1,225.23
 

 Paid thru escrow 1,100.00
 

 Bal. due D.B. $ 125.23 125.23
 

 Bonnie’s interest to July 7th, 1948, 6 mo. on $2,000.00 $100.00
 

 Arrowhead 1st $4,000.00 2 months at 40.00 per mo to July 1st $ 80.00 Arrowhead 2d $1,000.00 1 quarter to June 18th, 1948 25.00
 

 $330.23
 

 Paid in escrow $1,500.00
 

 330.23
 

 $1,169.77
 

 Paid June 10th 1948 F. O. Beyl
 

 O.K. paid D.B.Young ’ ’
 

 [3]
 

 "Q. And what was the conversation at that time? A. Well, we had finished the job and I came over to Mr. Young to talk about what had happened, and I said, ‘D.B., now this Lewis job is through. We have gotten a final on it and I guess everything is all right, as far as she is concerned.’ I said, ‘Now, D.B., I worked like the dickens on this job and I didn’t want to take it and it was quite a hard job. I had to go down to the Building Department. I had to make a set of plans. I had to go before the Board. I did a lot of the work personally, myself, with my own tools and I didn’t want that kind of a job and X knew the thing was going to cost you money. I told you it would.’ I said, ‘I have got
 
 *452
 
 a total of 38 days, actual working days, that I have kept track up here on the job, and I figure I should get $2,000 out of the job.’ ‘Well,’ D.B. said, ‘I know that cost some money all right. I have got a list of what we paid out here and you don’t owe me that much money. ’ He said, ‘ I think you owe me about $1,700, $1,800.’ I said, ‘Well, I have been making payments on it and if it is $1,700, $1,800, that is it, but I don’t know how you want to handle it.’ He said, ‘Well, we will have other deals. Say we just call it square.’ I said, ‘Well, this is our idea of cleaning up all the notes, now? We are all through with everything?’ I said, ‘This should pay off the $1,800 and then I won’t owe you anything?’ He said, ‘Well, that will clear it up; yes, that is it.’ He said, ‘If you will accept that,’ he said, ‘we will make it up some way to you.’ He said, ‘You figure you got a couple of thousand dollars, but,’ he said, ‘we will wipe the slate clean and that will be it.’ I said, ‘Okay, D.B., now you will take care of whatever it takes to clear these things oif?’ He said, ‘Yes, I am going over to Consolidated all the time.’ He said, ‘I will take care of the thing, release the trust deeds necessary,’ and he says, ‘You will have a clean slate.’ I said, ‘Well, gee, this is a relief, D.B. This is just swell.’ So with that we were able to start off with a new bill of health. ’ ’